FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff-Appellee,

v.

TOM MURPHY CONSTRUCTION COMPANY, INC., Thomas P. Murphy, Jr., Cynthia Murphy, Dale D. Stringer and Sandra A. Stringer, Defendants-Appellants.

No. 81–5089.

United States Court of Appeals, Eleventh Circuit.

April 30, 1982.

Roger A. Bridges, Coral Gables, Fla., Greene & Cooper, Marc Cooper, Miami, Fla., for defendants-appellants.

Kimbrell, Hamann, Hennings, Womack, Carlson & Kriskern, Bruce Charles King, Miami, Fla., for plaintiff-appellee.

Before VANCE, HATCHETT and ANDERSON, Circuit Judges.

HATCHETT, Circuit Judge:

This appeal, in a diversity action, requires application of Fla.Stat. § 725.01 to an indemnification contract which required written notice for termination. Finding genuine issues of fact to be litigated, we reverse and remand.

## FACTS

Tom Murphy and Dale Stringer were equal shareholders in Tom Murphy Construction Company, Inc. (Murphy Construction), a Florida corporation primarily engaged in the field of municipal construction. In order to successfully bid on public construction projects, a bid payment and performance bond was required to be submitted along with the bid. Bonding for Murphy Construction's bids was handled by Robert Benson, a licensed insurance agent employed by a local agency representing many large commercial line insurance companies, including Fidelity and Deposit Company of Maryland (F&D). Through Benson, bonding was arranged with F&D.[1]

As part of the decision to provide bonding, F&D required Murphy and Stringer and their wives to execute an indemnity agreement holding F&D harmless from losses it might sustain should Murphy Construction default on obligations arising out of the bonded projects. According to Edmond B. Blondell, Jr., vice-president of F&D in charge of the Miami branch office, this was standard industry procedure. On July 11, 1975, the Stringers and the Murphys signed an "Agreement of Indemnity" as individual indemnitors. The agreement provided:

## TERMINATION

Nineteenth: This Agreement may be terminated by the Contractor or Indemnitors upon twenty day's written notice sent by registered mail to the Surety at its home office at Fidelity Building, Charles and Lexington Streets, Baltimore, Maryland 21203, but any such notice of termination shall not operate to modify, bar, or discharge the Contractor or the Indemnitors as to the Bonds that may have been theretofore executed.

Twentieth: This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed to form a part hereof.

Dale Stringer claims that in August or September, 1975, he agreed to sell his interest in the company to Murphy and that by November of 1975, he no longer worked for Murphy Construction.[2] Furthermore, Stringer insists he orally notified Benson in October, 1975, of his leaving the company and that he and his wife no longer wanted to be listed or relied upon by F&D as indemnitors under the previously signed agreement. At that point, Stringer believed his obligations with respect to Murphy Construction were ended.

In October, 1978, F&D brought suit on the indemnity agreement against Murphy Construction, the Murphys, and the Stringers for losses F&D sustained on three projects bonded for Murphy Construction. The projects consisted of an addition to Coral Gables Senior High bonded on December 12, 1975, a subregional library project bonded on March 8, 1977, and a State Department of Transportation maintenance project bonded on March 21, 1977. The losses on these projects totalled $341,051.17.

Through discovery, the Stringers sought to substantiate their claim that the indemnity agreement had been terminated as to them by the oral notification to Benson. Benson testified on deposition that he knew of Stringer's departure from Murphy Construction as early as October 2, 1975. In a letter to Murphy dated October 2, 1975,

---

1. In his deposition, Benson stated that he first contacted Murphy Construction in 1974, and on its behalf, procured bonds from United States Fidelity & Guaranty Company, and later from the Insurance Corporation of North America. Business was subsequently transferred to F&D in order to obtain larger bonding capacities. Benson Dep. at 12–13.

2. The parties disagree as to the exact date the sale of Stringer's interest was finalized. Stringer claims the sellout was formally completed by November, 1975. Because the written agreement between Stringer and Murphy provides Stringer with additional payouts and compensation in the form of consultant reimbursements through the year 2004, F&D maintains that until that time, Stringer would not be totally divested of all his interest in Murphy Construction.

Benson stressed the need for a new financial statement "particularly in light of your buying out Dale Stringer's interest in the Corporation." Benson further testified that he informed Blondell, F&D's vice-president in the Miami office, that Stringer was no longer with Murphy Construction.[3] Benson never stated, however, that the Stringers had requested him, orally or otherwise, to terminate the indemnity agreement.

Blondell stated in his deposition that once an indemnitor notified F&D that he no longer wished to be bound by an indemnity agreement, F&D would not rely on his financial status for possible liability on bonds issued for future projects.[4] He could not say for certain when he first learned of Stringer's leaving Murphy Construction, but his recollection of conversations with Murphy and correspondence from Benson would put the date in late 1975 or early 1976.

On the day scheduled for a jury trial, counsel for F&D presented to the district court a motion in limine seeking to define and limit the issues to be litigated. In particular, this motion sought to preliminarily exclude defensive testimony regarding the termination of the business relationship between Stringer and Murphy, defensive testimony regarding the alleged oral termination of the indemnity agreement by the Stringers, and the constructive notice to F&D of the alleged oral termination and defensive testimony regarding F&D's non-reliance on the Stringers for further indemnification. F&D argued that the agreement of indemnity precluded termination by any means other than written notice and evidence of an oral termination was irrelevant.

The district court granted the motion subject to the Stringer's proffer of evidence tending to show modification of or changes made to the terms of the indemnity agreement. If given the opportunity to do so, counsel for the Stringers stated he would present evidence to the jury indicating that

3. At his deposition, Benson testified:
    Q: [By Stringer's counsel] Now, with whom did you communicate with F&D as to changes in the company? I believe you told us that you talked to them quite often by telephone. To whom did you talk for the most part?
    A: Mr. E. B. Blondell, Jr.
    Q: Now, he is local, is he not?
    A: Yes.
    Q: Can you recall today who you told back in October of '75 that Dale Stringer was no longer with Tom Murphy Construction Company?
    [Counsel for F&D]: Objection, I'm not sure he told anybody that.
    [Counsel for Stringer]: Go ahead.
    Benson: I feel quite confident that I indicated to Mr. Blondell that Dale Stringer no longer had an interest.
    Q: [By Stringer's counsel] Was that part of your responsibility as an agent for F&D, to report to the company the various changes that had any affect upon the company's ability to be bondable?
    A: Yes.

4. At Blondell's deposition, the following exchange occurred:
    Q: [By Stringer's counsel] Let me ask you this: Is it not true that if at any time F&D is notified by an indemnitor they are no longer part of the company and no longer wish to indemnify the companies—in this case it was Tom Murphy Construction Company—that in the future, their indemnity will be relieved. Is that correct?
    A: Correct, for future liability.
    Q: Of any future bond?
    A: Correct.
    Q: Let me ask you this question: If the Stringers had notified Benson that they were no longer to be associated with the company and wanted to be relieved of liability in the future, then would F&D have attempted to hold them liable for 3/8/77 and 3/30/77 [two of the three bonds where losses occurred]?
    [Counsel for F&D]: Again, we are talking about a legal conclusion here, whether they would be held responsible or looked to for responsibility.
    [Counsel for Stringer]: I am asking F&D's opinion of it, not a legal opinion.
    Blondell: Do you want me to respond?
    [Counsel for F&D]: If you have an answer, sure.
    Blondell: Would you repeat it?
    [Question referred to was read by reporter as recorded.]
    Blondell: If we were officially notified, I would say that we were not looking to them for indemnity.
    Q: Benson could officially notify you, sir, could he not, of acting as an agent for F&D?
    A: Yes.

(1) the Stringers signed the indemnity agreement shortly before Dale Stringer sold his interest in Murphy Construction to Murphy; (2) F&D had admitted that Benson was its agent; (3) Stringer approached Benson in the offices of Murphy Construction in approximately October of 1975, and knowing him to be the agent of F&D, informed him that he was leaving the company; (4) Stringer told Benson that he would no longer be liable for performance bonds issued in the future on Murphy Construction's behalf by F&D; (5) Benson informed Stringer that he would take care of the situation so that there would be no liability; (6) Stringer never received a copy of the indemnity agreement; (7) Stringer relied upon Benson's statements to him that he would have no future liability on future payment and performance bonds; (8) no bond written while Stringer was an indemnitor caused a loss to F&D; (9) from the time Stringer notified Benson, F&D did not at any time thereafter request from Stringer updated financial statements, or institute any other action normally undertaken had F&D considered Stringer to still be liable as an indemnitor; and (10) the bonds sued upon were issued by F&D with full knowledge Stringer was no longer involved with Murphy Construction and had previously given notice that he would not be bound as an indemnitor after October of 1975.

Counsel for the Stringers also proffered that by June of 1976, F&D determined that Murphy Construction had reached the outside limits of its bonding capacity and only because Murphy Construction entered into a joint venture with the E.C. Ernst Construction Company was further bonding permitted. The testimony of Blondell was proffered to show that in the event Benson notified him that Stringer no longer wished to be relied upon as an indemnitor, F&D would not look to the Stringers in the future for any indemnification.

Despite this tender of proof, the district court adhered to its earlier ruling that the indemnification agreement controlled the legal issues involved and termination by any means other than those specified in the agreement were prohibited. The ruling stated:

> That all prior negotiations are merged into that instrument, and that the tender of proof as to subsequent events does not produce any evidence of subsequent events sufficient to constitute a modification of the terms of the written indemnity agreement, and therefore that the Stringers are liable on the terms of that agreement for the bond claims now in litigation.

Liability having been established, F&D proceeded with its case on the issue of damages by calling the claims attorney for F&D's Miami office to testify on the validity of the losses in question. A final judgment of $383,840.98 was entered against the Stringers.[5] This appeal involving the Stringers and F&D followed.

## ISSUES

As the basis for reversing the district court judgment, the Stringers assert that timely acceptance of their offer to indemnify F&D was not demonstrated, and, even if it were timely accepted and therefore became a binding contract, it could be terminated at any time by an oral agreement notwithstanding the clause in the indemnity agreement requiring notice of termination to be in writing. Our task, then, in construing Florida law is to decide whether an indemnification contract required to be in writing by Fla.Stat. § 725.01[6] to be en-

---

**5.** The district court awarded F&D $383,840.98 in damages and also granted the Stringers' cross-claim against Thomas P. Murphy, Jr., for the amount of the judgment. A default judgment had previously been entered against Tom Murphy Construction Company, Inc.

This case was not disposed of in the district court on a motion for summary judgment. Because of the limited nature of the trial, however, we treat the disposition as though it were handled in summary judgment fashion.

**6.** Fla.Stat. § 725.01 provides, in pertinent part:
No action shall be brought ... upon any special promise to answer for the debt, default or miscarriage of another person ... unless the agreement or promise upon which

forceable can be terminated by an oral agreement, despite a provision in the contract which requires written notice to the surety in order to properly terminate.

### Acceptance by F&D

The Stringers initially argue that F&D is not entitled to indemnification because no evidence as to the timely acceptance of the indemnification agreement by F&D was presented at trial. Although the copy of the "Agreement of Indemnity" attached to F&D's complaint and signed by the Stringers and Murphys was not signed by a representative of F&D, the company later filed a copy of the original agreement which contained the signature of an F&D vice-president. The signed original was admitted into evidence at trial as an exhibit and has been included in the record on appeal. It is undisputed that F&D signed the agreement at some point; the question is whether the signing occurred before or after Stringer purportedly informed Benson of his desire to terminate the indemnification agreement.

In light of the disposition we make of this case, we think it unwise to answer that question on the record before us. It is a fact issue to be determined at trial, if presented for resolution.

In order to reach the legal issue presented, we assume that F&D did accept the indemnification agreement at some time prior to the alleged oral termination agreement between Benson and Stringer. We turn now to the critical aspect of this case: The propriety of an oral agreement terminating a contract specifying otherwise.

### Oral Termination Agreement

■ Despite clear language in the indemnification agreement forbidding termination except by written notice, the Stringers contend that the Florida Supreme Court and the former Fifth Circuit have expressed the rule in Florida to be that oral termination is permissible even though the written contract prohibits any modifications except

such action shall be brought, or some note or memorandum thereof shall be in writing and

in writing. The Stringers rely primarily on *Professional Insurance Corp. v. Cahill*, 90 So.2d 916 (Fla.1956). In *Cahill*, the plaintiff was employed as a salesman by the defendant insurance company, the terms of the employment evidenced by a written agreement prohibiting waiver or modification except in writing and executed by an officer of the company. Cahill subsequently left the company and brought suit alleging that the written contract had been orally modified by the parties so as to provide him with extra compensation for added services. The company's affirmative defense asserted the alleged oral agreement was void because of the terms of the employment contract. The Supreme Court of Florida held that this defense was insufficient as a matter of law and stated:

> The rule is well settled that an executory or parole agreement will not be permitted to abrogate or modify a written or sealed instrument, but this rule is not without exceptions. A written contract or agreement may be altered or modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it. *Moses v. Wood*, 1933, 109 Fla. 348, 140 So. 651, 141 So. 117, 147 So. 690. . . . An oral modification under these circumstances is permissible even though there was in the written contract a provision prohibiting its alteration except in writing. [Citations omitted.]

*Cahill*, 90 So.2d at 918.

The former Fifth Circuit applied the rule set out in *Cahill* in *Canada v. Allstate Ins. Co.*, 411 F.2d 517 (5th Cir. 1979), another case involving an employment contract of an insurance agent. The contract provided that it could be terminated by either party by making written notice to his or its last known address. Noting *Cahill*'s pronouncement of Florida's general rule enforcing oral modifications of written agreements, the court emphasized the breadth of the Florida rule by stating that it "goes even further and allows an oral modification of a

signed by the party to be charged therewith. . . .

written contract under circumstances of detrimental reliance even though the contract contains a provision prohibiting its alteration except in writing." *Canada*, 411 F.2d at 519–20 (citing *Cahill*, 90 So.2d at 918).[7] This rule applies with equal force to the situation at bar.

■ F&D suggests that *Cahill* and *Canada* stand for the proposition that oral modifications are effective despite prohibitive language in the contract only where clear and unequivocal evidence of a mutual agreement is presented. In addition, F&D urges that the district court was correct when it found no facts supporting the notion of a mutual agreement in this case. We agree with F&D's interpretation of *Cahill* and *Canada*. Whether facts of a mutual agreement exist in this case, however, is disputed. Because the trial court's granting of the motion in limine prevented the presentation of any evidence of the alleged conversation between Benson and Stringer, the law in Florida as stated in *Cahill* could not be applied. Stringer posits that the conversation with Benson resulted in a clear understanding that the Stringers' obligations under the indemnification agreement were ended. We are left then with a genuine issue as to a fact most material to the disposition of this case. The Stringers must be given an opportunity to establish if and when the conversation took place, and, if it did, what exactly was agreed to.

■ F&D further contends the Stringers made no change of position which manifested a detrimental reliance on the oral termination as required by the rule of *Cahill*. According to F&D, the Stringers would have had to commit their finances to a new business venture in order to show reliance, and their inactivity cannot constitute a change in position. This contention is untenable. If the conversation took place as alleged, the Stringers relied on the understanding that Benson would see to it that F&D was notified. The resulting judgment of $383,840.98 is unquestionably detrimental.

■ In an effort to surmount the predictable outcome in light of *Cahill* and *Canada*, F&D submits the argument that the Florida Statute of Frauds would be frustrated if the Stringers were allowed to circumvent the provisions of the indemnification agreement. Under Fla.Stat. § 725.01, contracts of indemnity containing promises to answer for the debt or default of another, such as the one here, come within the realm of the statute. F&D would have us adopt the general rule as stated in treatises to the effect that an oral agreement is insufficient to rescind or abrogate a contract required by the statute of frauds to be in writing. The Stringers are of the opinion that the statute of frauds is inapplicable because it only prevents the maintenance of an action to enforce oral contracts within its terms and the alleged oral termination agreement in question is not a promise to answer for the debt or default of another.

We are unpersuaded by F&D's contention that Benson and Stringer could not enter into a subsequent oral agreement nullifying the terms of the writing. This contention misses the mark. The moment after the agreement of indemnity was accepted by F&D, nothing in the termination clause of paragraph nineteen prevented the parties from immediately thereafter entering into a new agreement which would terminate the indemnification contract in a manner other than in writing. It is with the legality of this alleged oral agreement that we are predominately concerned, not the terms of the written contract which by its very nature is required by section 725.01 to be in writing to be enforceable.

The purpose of the statute of frauds is to establish a recording of an extraordinary undertaking: the promise to answer for the debt or default of another. The law is reasonable in requiring promises of this type to be in writing. An oral agreement

7. *See also Merchants & Bankers Guar. Co. v. Downs*, 128 Fla. 767, 175 So. 704 (1937) (insurance policies may be cancelled by mutual consent notwithstanding policy provision specifying method of cancellation). *Accord, Midstate Hauling Co. v. Reliable Ins. Co.*, 437 F.2d 616 (5th Cir. 1971).

to terminate an indemnification relationship is not such an extraordinary undertaking that the law requires written evidence of the event. Accordingly, general principles of contract law should govern the validity of such agreements.[8] As *Cahill* and *Canada* indicate, the rule in Florida regarding the general law of contracts on this subject is well settled. The indemnification agreement signed by the Stringers and Murphys and accepted by F&D could be terminated by an oral agreement between Stringer and the agent, Benson.

## CONCLUSION

Based on the foregoing, we conclude that the district court's granting of F&D's motion in limine effectively precluded the resolution of factual matters dispositive of the outcome of this litigation. We therefore reverse the district court judgment and remand the case for a new trial because of the existence of genuine issues of fact, namely, whether the Benson-Stringer conversation and resultant understanding ever occurred. If the alleged agreement were consummated, the rule as expressed in *Cahill* and repeated herein governs the legal consequences of the oral agreement.

REVERSED and REMANDED.

8. No Florida case has directly addressed the question of whether an agreement required to be in writing by Fla.Stat. § 725.01 to be enforceable can be terminated by a subsequent oral agreement. The trend in other jurisdictions appears to recognize the permissibility of oral termination agreements. *See, e.g., Consolidated Elec. Distribs., Inc. v. Gier*, 24 Wash. App. 671, 602 P.2d 1206 (1979) (summary judgment inappropriate where disputed question of fact exists as to mutuality of oral termination of guaranty relationship); *Dicker v. Lomas & Nettleton Fin. Corp.*, 576 S.W.2d 672 (Tex.Civ. App.1978) (affidavit for summary judgment purposes raises fact question whether parties' oral agreement and subsequent conduct was sufficient to prevent operation of statute); *ABC Outdoor Advertising, Inc. v. Dolhun's Marine, Inc.*, 38 Wis.2d 457, 157 N.W.2d 680 (1968) (contract within statute could be cancelled orally despite contrary provision in contract); *West River Equip. Co. v. Holzworth Const. Co.*, 134 Mont. 582, 335 P.2d 298 (1959) (statute of frauds does not preclude oral rescission of written contract within statute); *Watkins v. Sim-*

*plex Time Recorder Co.*, 316 Mass. 217, 55 N.E.2d 203 (1944) (contract within statute may be orally rescinded except where recission involves subject matter required by statute to be written).

Essentially, F&D is attempting to assert the statute of frauds as a defense to the alleged oral termination agreement. This question was undecided in a case involving the statute as it relates to employment contracts not performable within the space of one year. In *Grossman v. Levy's*, 81 So.2d 752 (Fla.1955), the employee sought to enforce a contract which renewed a prior, oral employment agreement. The employer defended on the ground that because the initial agreement was oral and therefore unenforceable, the renewal contract "was fatally infected with the same malady." 81 So.2d at 753. The court rejected this reasoning and held that because the employee was not seeking to enforce the original employment contract, proof of the oral agreement could be used for evidentiary purposes. The court did not intimate whether the statute could be used as a defense.